## ARMSTRONG CORK CO. v. W. & J. SLOANE MFG. CO.

Circuit Court of Appeals, Third Circuit.
June 28, 1928.

Rehearing Denied September 1, 1928.

No. 3782.

**1. Words and phrases—"Plain linoleum," "painted linoleum," and "inlaid linoleum" defined.**

"Plain linoleum" is made by passing between heated rolls a burlap backing and a superimposed layer of hardened linseed oil mixed with ground cork; "painted linoleum" has figures painted on its surface; "inlaid linoleum" gets its name from varicolored inlays or figures, which are cut from rolled sheets and placed or inlaid on burlap to form patterns, after which superimposed inlays and burlap are by heat and pressure cemented together, with result that juncture line between different colored inlays is sharp and distinct.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Linoleum.]

**2. Patents ⑄328—1,630,085, for indented "molded inlaid linoleum," held valid and infringed.**

Humphreys and McCarthy patent, No. 1,630,085, for indented molded inlaid linoleum floor covering, having a molded inlaid varicolored pattern, *held* valid and infringed; "molded inlaid linoleum" being a stencil process, whereby a stencil provided with sections in form of different parts of desired varicolored pattern is placed on burlap, and each section is filled with a loose granular mixture of linseed and cork of the desired color, and, on stencil's being withdrawn, burlap with superimposed stenciled divisions passes beneath a powerful press, which compresses the stenciled blocks and cements them to each other and to the burlap, and usual second pressing incident to linoleum follows, resulting in a smooth, even-surfaced linoleum, with color pattern delineated thereon.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Patent infringement suit by the Armstrong Cork Company against the W. & J. Sloane Manufacturing Company. Decree for defendant, and plaintiff appeals. Vacated, and record remanded, with instructions.

George E. Stebbins, Clarence P. Byrnes, and Byrnes, Stebbins & Parmelee, all of Pittsburgh, Pa., for appellant.

Newell & Spencer and Herbert W. Backes, of Trenton, N. J. (Emerson R. Newell, of New York City, and Frederick P. Fish, of Boston, Mass., of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. [1] This case concerns generally the floor covering linoleum, and specially and from a patent standpoint only one kind, viz. "molded inlaid linoleum," as distinguished from plain linoleum, painted linoleum, and straight-line inlaid linoleum. Plain, single-colored linoleum is made by passing between heated rolls a burlap backing and a superimposed layer of hardened linseed oil mixed with ground cork. It has been so made since 1860. Painted linoleum has figures painted on its surface, and it, too, has been made since 1860. The third, or inlaid linoleum, gets its name from varicolored inlays. Such inlays or figures are cut from rolled sheets and placed or inlaid on the burlap to form patterns, after which the superimposed inlays and burlap are by heat and pressure cemented together, with the result that the juncture lines between the different color inlays are sharp and distinct. It has been made since 1895. These three types were well known in the art, are not covered by patents, and with them, therefore, the patent in suit has no concern.

The fourth type is called molded inlaid linoleum, and it came into the art in 1880. It is a stencil process. A stencil, provided with sections in the form of the different parts of a desired varicolored pattern, is placed on the burlap, and each section is filled with a loose granular mixture of linseed and cork of the desired color. The stencil being withdrawn, the burlap, with the superimposed stenciled divisions now making the desired pattern, then passes beneath a powerful press, which compresses the stenciled blocks and cements them to each other and to the burlap. The usual second pressing incident to linoleum follows, and the result is a smooth, even surface linoleum with the color pattern delineated thereon. It is to this fourth, or stenciled, molded type of linoleum, and to it alone, the patent in suit is limited.

Now, to appreciate the novelty and radical departure of the patent in suit from the status of the linoleum art, the all-important fact must be recognized that, ever since linoleum was made, it was made with an even, unbroken surface. This was natural. A smooth floor will not pocket dirt, and is adapted for walking and cleaning. By trade tradition linoleum was made smooth, and no one ever thought of any departure from this uniform and universal practice. The fact, without any proven contradiction, appears in the record.[1]

It will also be noted that, while the fourth, or stenciled, linoleum came on the market in 1880, it was not acceptable to the trade; a witness stating: "I think I stated we were up against that particular problem, and it was one that was reducing the sale of our molded linoleum goods. They were gradually going down hill; in some cases, possibly not going down hill, but standing still." Indeed, this fourth type was being largely supplanted by the third or inlay type, and the decline in demand for it was such as to lead manufacturers to change their machines over to making the straight-line or third species. The proof of one witness was: "The molded inlaid linoleum business suffered severely from the straight-line inlaid after the advent of the straight-line. I know of one company who dropped 14 of the grid press operations due to the competition of straight-line, and they replaced the production with straight-line inlaid."

"The reason for this is quite apparent. In the straight-line inlay process the pattern sections, cut from solid, hardened sheets, have distinct, sharply defined edges. Consequently the lines of these sharply defined edges are not changed by the subsequent pressure, and give to the product the straight-line character which has crystaled into a trade-name, and the trade product, "straight-line," most in demand with the public. These straight-line linoleums, as we have said, largely supplanted the stenciled or molded linoleum, which came into use in 1880, because they substituted the desirable straight for the undesirable ragged edge lines of the molded linoleum. This ragged edge was due to the fact that, after the stencil pattern is removed, and the loose, granular, varicolored mixes are subjected to pressure, the particles move laterally, and the different colored pattern sections interlace and produce irregular lines between the different colored inlays. These facts are conclusively shown in the proofs printed in the margin.[2] We

[1] Prentiss, with 21 years' experience in the manufacture of linoleum, says: "It was the tradition of the linoleum trade to make the goods just as smooth and just as dirt-repellant, if I may use the term, as possible." Stickel, with 17 years' experience in its sale, says: "During my experience, I have never known of a linoleum offered for sale that did not have, or purport to have, a plain surface."

[2] Prentiss says: "The molded inlaid business, despite all of our efforts to expand it, was a lagging business, and one which did not keep pace with the development of the other portions of our linoleum business. It was on the downward trend, because of the competition of straight-line inlaid linoleum, which in the minds of the general public was preferable, owing to its sharp, clear division between the inlays, to the molded inlays, which had these serrated

will not discuss the reasons given in the proofs by architects, decorators, and dealers

lines. The flat molded inlaid linoleum, as I have just said, had the irregular saw-tooth lines between the different tiles in the pattern. The average customer preferred the straight line inlaid. It seemed to look better to him. Furthermore, from an artistic viewpoint, architects, for example, objected to the molded inlaid because it had a mechanical appearance."

Kates, in the floor covering business for 35 years and connected with one of the largest floor covering wholesale companies in the country, testified: "The trend of the flat surface molded inlaid linoleum business declined, so that we sold very little, about 5 per cent. of our business, most of which was the straight-line goods."

Jones, one of the general officers of the plaintiff, testified: "Q. 38. Has this irregular line always been recognized as a defect in the molded goods? A. Always. All the efforts of linoleum manufacturers have been to get away from that particular defect. Hence the introduction of the straight-line. Q. Did they ever get away from the trouble with that defect in the irregular line? A. Not in any of the systems wherein stencils are used. The older form of grid, what is known as grid process inlaid, had a straighter line than the present almost universal type of stencil molded inlay. The grid system, however, is entirely too expensive to operate, and practically very few companies are now operating that system. Q. So that the great production is by the stencil system, which necessitates a pretty irregular line? A. I think you would be perfectly safe in figuring 90 per cent. of the molded inlaid linoleum is produced by the stencil method."

Stickel, a witness already quoted, testified: "The trend of the inlaid business was less molded goods being sold, more straight-line goods being sold."

In an article in the Scientific American in 1907, given in evidence by the defendants, it is said: "The molded linoleum may be readily distinguished from the straight line by the ragged edges of its design."

"Tomec, a general officer of the defendant, and with practical experience in the art, referring to the statement that, "in making a piece of linoleum with the molded inlaid method, it is a necessary consequence that the lines of juncture between the inlays be irregular," and that "this is due to the composition, the granular composition," and that, "when the composition is pressed with a flat plate, the granules at the edges sort of interlace, and necessarily result in irregular lines," testified: "Well, it was always not desired. We tried to make the lines as clear as possible." He also testified as follows: "Q. 265. Why do you want the straighter line? A. All the aim in the linoleum industry was always for straight lines. Q. The linoleum industry regarded his rather ragged line of the molded goods as a defect, didn't it? A. Yes; but they couldn't get away from it. Q. How long has molded inlaid linoleum been made? A. Well, I couldn't tell you exactly; but I think about since 1892, somewheres around there. Q. And during all this time this jagged line has been regarded as a defect that they couldn't get away from; is that right? A. It was always there; yes, sir."

why the public did not take to molded linoleum, but the simplest and most satisfactory ground to us is, as stated by a decorator and writer on the subject, who says his objection to it is that "it looks just like what you may say a painted decoration on a floor, and therefore a cheap, inferior product, which, for want of a better article, was limited to kitchens, bathrooms, and the like."

In this state of the art, in the face of all its hostile traditions, the patentees, who were employees of the plaintiff, took a startling step, one that flew in the face of universal practice slavishly followed in the whole floor covering art, and in taking that step utilized the ragged edges, which had condemned molded linoleum in the eyes of the public, into an element of favor which led the rejected molded linoleum to outsell by leaps and bounds the straight-line product, and opened new fields of use for linoleum to which it had never aspired. This remarkable result was effected by the very simple thing of abandoning the time-followed practice of even-surfaced linoleum, by indenting the juncture which formed the objectionable ragged edges. Indenting leather was an art as old as bookbinding, and, indeed, the indenting for wall coverings of Lincrusta Walton, which was but another type of linoleum, had been practiced for 30-odd years. But, in spite of these practices and uses being well known, it is strange no one had even thought of indenting linoleum, and herein lies the inventive thought; for, when once thought of, the doing of it physically was but the indenting of a hitherto plane surface floor covering. But how out of the to be expected this thought was is shown by the proofs that, even when those skilled in the art were told of it, they distrusted it. In that regard we refer to the proofs in the margin.[3]

---

[3] Jones, the experienced general manager of the plaintiff, when it was called to his attention, distrusted it: "When this embossed molded inlaid linoleum was first submitted to me, my reaction was not favorable, for the reason that, in common with all manufacturers of linoleum, I had been accustomed to produce, and bending all my efforts to producing, a smooth-surfaced piece of linoleum. This suggestion seemed to be so foreign to any of our preconceived notions that I was naturally skeptical. There were two difficulties that confronted us: One was the possibility of those embossed or indented portions absorbing dirt, and the other was that the stretch of the goods under the embossing press would probably distort them to such an extent that we couldn't fit the plate to the pattern. We found a certain percentage of stretching of the goods, as would be natural in the consolidating or embossing of any sheet of

[2] Seeing, then, that the indented molded linoleum was novel, proved useful, and built up from an old and dwindling product a really great business, we turn to a study of the patent in suit and the question of its validity. That patent is No. 1,630,085, granted May 24, 1927, to Humphreys and McCarthy, assignors to the Armstrong Cork Company, for linoleum floor covering and process of manufacture. It is expressly

material, but we were agreeably surprised to find as little difficulty as we really developed."

The defendant company felt the same way. Griswold, its vice president, testified: "At the time that we were considering putting out the indented linoleum, in the fall of 1926, there was some hesitation in my mind about putting out this indented form of linoleum. We understood the Armstrong Cork Company were putting out some indented embossed, and I believe, although I cannot give you an exact reference, some mention had been made to its being protected, or they were going to have it protected, and that feature was discussed. We discussed also the matter of whether the public would take it. There was some question about the market attractiveness of it, whether the public would consider it a desirable material, owing to its indentations and the greater likelihood of its collecting dirt."

The novel and radical step taken by the inventors, the distrust with which it was received, and the invention's ultimate vindication of itself, is aptly stated by Jones in an affidavit in the file wrapper as follows: "When the idea of embossing inlaid linoleum was submitted to me by the inventors, my opinion was not favorable to the idea, as I foresaw several practical obstacles in the way of carrying out this work successfully, at the same time admitting that the appearance of the goods was materially improved. My first objection was on the score of dirt collecting in the depressions and being difficult to remove. The second and more important factor, from the manufacturing standpoint, was the question of distortion or stretching of the linoleum, due to the action of an embossing plate or roll. These objections appeared to be perfectly valid, and experimental work was not immediately commenced. At a later date the inventors prepared a small sample of linoleum by indenting certain of the colors with a hand punch; one half of the sample being indented and the other half left plain. This practical demonstration brought out the interesting features of this improvement to such an extent that it was decided to go ahead with experiments to determine its practicability. A small embossing plate was prepared, and the results were sufficiently encouraging to warrant the necessary investment in a full-sized embossing equipment; this being necessary in order to determine the difficulties incident to correctly repeating the embossing after the stretch had taken place. Immediately on completion of this full-sized equipment, considerable experimental work was done, and satisfactory means were finally worked out to control the repeat within such limits as would be acceptable to the public. The material was then exhibited at our annual Jobbers' Convention and met with immediate approval. The fact that this article was entirely novel and a distinct departure from the regular line of linoleums is evidenced by the fact that it has gradually replaced our regular smooth-surfaced

molded inlaid production to the extent of over 50 per cent. This year's sales will be well in excess of $1,000,000."

With the public, success of the patented product was immediate. In that regard, Prentiss, of the plaintiff company, testified:

"Q. 24. Did you know what the general attitude of the officials of the Armstrong Cork Company was to this invention when it was submitted to you? A. Our attitude was lukewarm. It was so revolutionary, and contrary to all of the previously accepted standpoints, you might say, of the linoleum trade, that we felt that it was an interesting sort of a looking thing, but it had no particular—it probably would have some real trade disadvantages. I say that, because we had had some experience with rough-surface linoleum in the past, and found that the consumer objected to it, because it was difficult to clean. I refer particularly to printed linoleum of the matting or carpet pattern type, in which globules of paint were so applied to the surface that there remained little knobby points of paint on the surface of the linoleum when the paint dried. We found that was such a serious disadvantage in selling the goods that we were compelled to change our printing blocks, and later the type of paint we used, so that the paint would flow on and make as nearly an even surface as possible. Consequently, when this method was submitted to us, the first thing that came to our mind was: 'The consumer is apt to object to this.'

"Q. 25, 26. This linoleum you speak of was flat-surface linoleum? A. It was flat-surface linoleum, but the way the paint was thrown on it was rough.

"Q. 27. What converted you to the embossed inlaid linoleum, after you had been lukewarm to it? A. The way the public received it. We put in 11 patterns in November, 1925, a comparatively small number, because we looked on it as an experimental proposition. They were shown to our wholesalers at a convention they had in Lancaster in 1925. Some men expressed immediate enthusiasm for the material. Others wondered whether the consumer would really accept it because of the possibility of difficulty in cleaning. All of them placed more or less what you might term 'trial orders.' The goods then came into the hands of the retailer, and the public response ran far ahead of anything we had ever expected, and the business very rapidly developed into an important one. * * * Starting in 1925, the last 2 months of the year, when this embossed material was introduced, we sold $86,000 worth, and for the 10 months ending November 1, 1927, our sales were $2,396,000, a total of $4,000,000 in two years, and, as is shown very clearly, the gradual shrinkage in the flat molded business, because of the great desirability that the embossing added to the type of goods, the molded inlaid business has shown, as I say, a tendency not to grow, in contradistinction to the other divisions of our business."

limited to molded, inlaid, varicolored linoleum, as we earlier stated; the specification stating: "The present invention relates to linoleum floor covering and to the process of manufacture, and more especially to a linoleum having a molded, inlaid, varicolored pattern, brought into relief by having certain of the inlays sunk below the general surface level. The invention is particularly applicable to molded inlaid linoleums having tile patterns, which may be made to stand out by depressing the mortar joints." It discloses a workable process and its product in these words: "Referring to the illustrated embodiment of the invention, reference numeral 1 indicates a sheet of linoleum having the usual burlap backing 2 and a layer of linoleum composition 3 applied thereto. The linoleum layer is formed of inlays indicated by reference numerals 4, 5, 6, 7, and 8. The inlays 4, 5, 6, and 7 simulate floor covering tiles, while the inlays 8 simulate the mortar joints between the tiles. The inlays 8 should be of a color varying from the color or colors of the inlays 4, 5, 6, and 7, in order to simulate the difference in color between the mortar and the tiles. * * * The inlay portions 8 are sunk or depressed into shallow grooves 9, as shown in Figures 3 and 4, to simulate the depressed mortar joints occurring in tile floors. The pressed mortar joints bring the tile pattern into relief and made a linoleum of a much more attractive appearance than plane-surface, tile-pattern linoleum. The relief given to the colored pattern makes it stand out strikingly. It also breaks up the smooth light-reflecting surface afforded by a plane-surface linoleum. In looking across a room toward a window, the colored pattern of a plane-surface linoleum may be lost in the reflected light, whereas the same pattern, when brought into relief by indenting certain of the colored figures thereof, is distinctly visible under the same conditions."

Differentiating their product from straight-line linoleum, the patentees say: "The present invention relates to linoleum floor covering and to the process of manufacture, and more especially to a linoleum having a molded inlaid varicolored pattern, brought into relief by having certain of the inlays sunk below the general surface level. The invention is particularly applicable to molded inlaid linoleums having tile patterns, which may be made to stand out by depressing the mortar joints, and will therefore be illustrated and described with particular reference to such embodiment of the invention; it being understood, however, that the invention is not so limited, but may also be embodied in other patterns."

Claims covering process and product were granted, but, as the defendant's practice is a duplication thereof, we refrain from discussing the same. After due consideration had, we find nothing to overcome the prima facie of patentability arising from the patent's grant. It was a radical, original, and unlooked-for disclosure. The accepted tradition and settled practice of the art stood as an accepted fact, and an accepted bulwark to any such step or innovation. It gave new life to a shriveling product, and so used the shriveling element of that product as to inject new and broader life thereto. Its instant and initial reception by the public showed it met a real need, and that appreciation by the public of its worth, without the publicity of advertising, was the real basis which enabled subsequent advertising to aid in broadening its market. Its unlooked-for success is explained, to our mind, by viewing two strips of linoleum of the same pattern and subjected to the same heat and pressure; one having the flat surface of the old process, the other the indented surface of the new. Looking at them with the light at one's back, they appear the same; but facing the light, and looking at them and seeing the difference between the dead, lifeless surface of the one and the bright-appearing surface of the other, with its clearly defined and outstanding patterns, one can sense the desire of the public for the one and its indifference to the other. It is such disclosures and improvements the patent system is meant to encourage by reward.

The decree below is therefore vacated, and the record remanded, with instructions to reinstate the bill and enter a decree of validity, infringement, and accounting.